**FOUNDATION ON ECONOMIC TRENDS, et al., Plaintiffs,**

v.

**Lee A. THOMAS, et al., Defendants.**

**C.A. No. 85–3649.**

United States District Court, District of Columbia.

March 6, 1986.

Edward Lee Rogers, Washington, D.C., for plaintiffs.

Elizabeth Ann Peterson, Ward Tabor, Carl Strauss, Lands and Natural Resources Div., Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Plaintiffs, various individuals and non-profit environmental organizations, seek injunctive relief against the Environmental Protection Agency's ("EPA") issuance of an experimental use permit ("EUP") to Advanced Genetic Sciences, Inc. ("AGS"), which authorized AGS to conduct a field test of bacteria strains altered by recombinant DNA technology. Plaintiffs contend that the EPA's issuance of the permit violated the requirements of the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§ 136–136y ("FIFRA"), the National Environmental Policy Act, 42 U.S.C. §§ 4321, et seq. ("NEPA"), and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA"). Industrial Biotechnology Association ("IBA"), of which AGS is a member, was permitted to intervene as a defendant. The case is before the Court on plaintiffs' motion for preliminary injunc-

tion, the motions for summary judgment filed by defendants and IBA, and plaintiffs' motion for relief under Rule 56(f) of the Federal Rules of Civil Procedure. The Court heard oral argument of counsel on the pending motions on February 28, 1986. Upon consideration of the memoranda in support of and opposition to the motions, the arguments and representations of counsel in open court, and the entire record of this case, the Court concludes that the motion for preliminary injunction should be denied and that the Rule 56(f) motion should be denied. The Court withholds decision on the motions for summary judgment filed by defendants and intervenor.

### FINDINGS OF FACT

EPA regulates the sale and distribution of pesticides in the United States under FIFRA through the statute's registration scheme, which prohibits the registration, and hence the use and marketing of pesticides which cause "unreasonable adverse effects on the environment." 7 U.S.C. § 136c(d). Any person seeking to test an unregistered pesticide may apply to the EPA for an EUP, which will control the conditions under which the testing may take place. EPA may only issue a permit if it finds that the proposed experiment is needed to produce data necessary for registration, and that the experiment will not cause unreasonable adverse effects on the environment. FIFRA § 5, 7 U.S.C. § 136c. Tests involving genetically engineered microbial pesticides must be presented to the EPA, to determine whether an EUP is necessary. The agency set out this requirement in a policy statement in the Federal Register, on October 12, 1984, as an interim measure to ensure agency supervision of the release of genetically engineered organisms into the environment. Administrative Record 6 (hereinafter "Ad. Rec."). Pursuant to their interim policy, EPA began its review of AGS' proposed recombi-

nant DNA experiments involving genetically altered strains of *Pseudonomas Syringae (P. syringae)* and *Pseudonomas Flourescens (P. fluorescens)* late in 1984. Ad. Rec. 7; 8. The naturally-occurring strains of these bacteria are involved in the formation of ice crystals on plant surfaces, known as "ice nucleation." Ice-nucleating active (INA+) bacteria promote frost formation and non-ice nucleating active (INA−) bacteria inhibit frost formation. Both forms of bacteria coexist in nature, although INA+ predominate. Through recombinant DNA technology, AGS has deleted genetic material from the INA− bacteria to produce INA− bacteria, in an effort to control frost damage on plants.

In August, 1984, following a request by several of the plaintiffs herein, the Hazard Evaluation Division ("HED") of the EPA Office of Pesticide Programs initiated its interim policy with review of several proposed recombinant DNA experiments which had been recommended for approval by the Recombinant DNA Advisory Committee of the National Institutes of Health.[1] Ad.Rec. 1:2. When informed of EPA's notification and EUP requirements, AGS submitted its INA− proposal to EPA, with supporting data, and formal EPA review began on October 31, 1984. Ad.Rec. 7. HED concluded that the test was not likely to pose significant risks to humans or the environment, but determined that AGS would have to provide more information before testing could be conducted under an EUP. Ad.Rec. 13. HED's specific areas of environmental concern were the dissemination of the mutant bacteria from the test site, the survivability and colonization abilities of the bacteria, and the possible effects from its release on precipitation patterns. *Id.*

HED's preliminary conclusions were reviewed by independent scientists on a subpanel of the FIFRA Scientific Advisory

---

1. Prior to the EPA's establishment of its interim policy, review of recombinant DNA experiments was undertaken by NIH. Approval of a related experiment involving genetically altered *P. syringae,* proposed by Drs. Lindow and Panopou-

los of the University of California, was the subject of this Circuit's decision in *Foundation on Economic Trends v. Heckler,* 587 F.Supp. 753 (D.D.C.1984), *aff'd in part and rev'd in part,* 756 F.2d 143 (D.C.Cir.1985).

Panel ("SAP") in January, 1985.[2] The SAP subpanel generally agreed with HED's conclusions. Ad.Rec. 36. In February, 1985 HED informed AGS that an EUP would be required for its proposed field test, and that additional data would have to be submitted on the bacteria's competitiveness, ability to colonize, host specificity and pathogenicity. Ad.Rec. 33, 37. AGS submitted a modified proposal in June, 1985, and included data responsive to the HED's requests. Ad.Rec. 42, 43. In addition, AGS requested a waiver of some of the EPA's additional standard data requirements, pursuant to 40 C.F.R. § 158.45. EPA published notice of this application in the *Federal Register* on August 21, 1985, and requested public comments. Ad.Rec. 54. HED's initial scientific position that the proposal presented no foreseeable risk issued on August 27, 1985, was reviewed by the U.S. Department of Agriculture, the Food & Drug Administration and NIH. Ad.Rec. 58–60. Public comments from plaintiff the Foundation on Economic Trends ("FOET") questioned the agency's conclusions about the bacteria's novelty, competitiveness, pathogenicity, and atmospheric role. Ad.Rec. 61. FOET also urged more laboratory study of the bacteria's effects. *Id.*

HED responded to FOET's concerns about the bacteria's role in precipitation by contacting the scientists FOET had referenced in their comments, and by contacting other meteorological scientists. Ad.Rec. 66–68, 70–73. The SAP subpanel finally concluded that the experiment was unlikely to pose significant risks and recommended approval of the application. Ad. Rec. 75. On November 5, 1985 HED summarized their final position, and responded specifically to public comments, concluding that, in light of the evaluated data and the limited scale of the proposed tests, the lack of the mutant's competitive advantage over the natural INA bacteria, AGS' experiment

"does not pose a significant risk of adverse environmental impact." Ad.Rec. 76:3; 77:6. HED addressed FOET's concerns about precipitation effect, "novelty" of the mutant, the need for further testing, the toxicology of the bacteria, and EPA's waiver of certain additional data requirements. Ad.Rec. 76:3–9.

The agency issued EUPs to AGS on November 14, 1985, effective December 1, 1985 through November 30, 1986. Ad.Rec. 81, 83. Plaintiffs filed this suit the same day, alleging that the agency action violated FIFRA, and was arbitrary, capricious and an abuse of discretion. Plaintiffs filed an amended preliminary injunction request on January 26, 1986.

Under the EUP, AGS can conduct a field test of INA− bacteria on a 0.2 acre site, in Monterey County, California, not less than 15 days after it notifies the agency of its intent to begin testing. An interim local ordinance passed in Monterey County prohibits the release of any genetically altered bacteria prior to March 28, 1986, preventing the test from occurring before that time. Additionally, the EPA has begun an investigation of AGS and its research facility following media reports that possible unauthorized open-air tests of the mutant bacteria have occurred. EPA represented to the Court that it will complete its investigation no later than March 24, 1986, and the parties have stipulated that no testing shall occur under the EUP before then.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter under FIFRA § 16(a), 7 U.S.C. § 136n(a), and section 702 of the APA, 5 U.S.C. § 702. To determine whether a preliminary injunction should issue in this case, the Court must weigh four factors:

1) Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal? ...

2. The SAP is composed of independent scientists and was established by FIFRA § 25(d) to advise EPA about the health and environment impact of certain agency actions. The SAP subpanel that reviewed AGS' proposal was composed of

637 F.Supp.—3

five university scientists with expertise in areas relevant to the range of environmental impact likely from release of genetically altered INA− bacteria. *See* Ad.Rec. 29.

2) Has petitioner shown that without such relief it will be irreparably injured? ...

3) Would the issuance of an ... [injunction] ... harm other parties interested in the proceedings? ...

4) Where lies the public interest? ...

*Virginia Petroleum Jobbers Assoc. v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958). *See also National Association of Farm Workers v. Marshall,* 628 F.2d 604, 613 (D.C.Cir. 1980) (quoting *Virginia Petroleum* ).

The merits of plaintiff's claims must be resolved under the standard of review set out in FIFRA and the APA. Under both statutes, the Court must review the EPA's decision to issue the EUP to AGS for abuse of discretion, and to determine whether it was arbitrary and capricious. *E.g., EDF v. Ruckelshaus,* 439 F.2d 584 (D.C.Cir.1971); 5 U.S.C. § 706(2)(A). The Court must presume the validity of the agency's action, and must affirm the agency's decision if it has a rational basis. *See EDF v. Costle,* 657 F.2d 275, 282–83 (D.C.Cir.1981); *Lead Industries v. EPA,* 647 F.2d 1130, 1145 (D.C.Cir.1980). In this review, the Court cannot substitute its judgment for that of the agency. At the same time, it does not merely "rubber stamp" agency action, but must review the record to ensure that the agency considered the relevant factors. *See EDF v. Costle,* 657 F.2d at 283; *Lead Industries,* 657 F.2d at 1145. Further, since the substantive basis of the decision centers on a scientific determination involving predictions at the frontiers of technology, the Court's review must be "at its most deferential." *Baltimore Gas & Electric Co. v. N.R.D.C.,* 462 U.S. 87, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983).

The case law on EUP review is sparse. Nonetheless, the Court determines that a two-step review is appropriate, comparable to that given agency issuance of permits which had required preparation of an environmental impact statement ("EIS") under NEPA. *E.g., Sierra Club v. Sigler,* 695 F.2d 957, 966 (5th 1ir.1983) (judicial review under NEPA is to ensure the procedural integrity of the agency's consideration of environmental factors in the EIS and in its decision to issue permits); *Farmland Preservation v. Goldschmidt,* 611 F.2d 233 (8th Cir.1979). Thus, plaintiffs must establish that there was a procedural defect in the agency EUP process, or that the agency's substantive decision to issue the EUP was arbitrary, capricious or an abuse of discretion, based on the record before the agency.

The data submission and agency review requirements for EUPs are set out at 40 C.F.R. § 172.4–172.5. The EPA imposed additional data and review procedures for microbial pesticide EUP applications. *See* Ad.Rec. 6. These procedures are to ensure that the permit is needed to accumulate information necessary for pesticide registration under FIFRA, and that the proposed testing will not have unreasonable adverse effects on the environment. 7 U.S.C. § 136c(a), § 136c(e); 40 C.F.R. § 172.2.

Plaintiffs contend that the EPA improperly waived certain data submission requirements for AGS in their EUP application. Data requirements for this type of test are set out at 40 C.F.R. § 158, *et seq.,* and may be waived on a case-by-case basis. 40 C.F.R. § 158.45. HED recommended granting the waivers, and upon consideration of the available information, the limited size and scope of the experiment and AGS' proposed safeguards, the EPA concluded that the waivers were appropriate. Ad.Rec. 43; 54:6; 76:8. No further procedure is required in a waiver determination.

Plaintiffs also challenge the substantive result of this EUP procedure, contending that EPA did not adequately consider the potential pathogenicity and toxicity of the bacteria, the likelihood of its dissemination and off-site reproduction, and the impact of release of INA— on atmospheric precipitation patterns. Plaintiffs also claim that the EPA did not give sufficient consideration to alternatives to the proposed test. In reviewing the adequacy of the EPA's consideration of these factors, the Court notes that the stringent procedural and substantive requirements of NEPA's EIS

standards do not literally apply to actions of the EPA in this case. *EDF v. EPA,* 489 F.2d 1247, 1256 (D.C.Cir.1973). The rationale for this exception is that EPA's actions already occur within a substantive regulatory framework that emphasizes the quality of man's environment, and a procedural framework that provides "full opportunity for thorough consideration of the environmental issues and for ample judicial review." *Id.* at 1256. This framework is functionally equivalent to NEPA, and to require formal compliance with the statute, when its purpose and policies have been fulfilled, would be "a legalism carried to the extreme." *Id.* Based upon its review of the record for purposes of the injunction, the procedures in the present case do not appear to the Court to have fallen short of this goal of "functional equivalence" with NEPA. *See id.* The EPA appears to have considered at each level of review each of the substantive elements plaintiffs raise in their challenge. The administrative record is, at worst, equivocal on these substantive claims, and in light of the deferential "arbitrary and capricious" standard of review applied to this decision, the Court does not find that plaintiffs have made a "strong showing" that they will succeed on the merits of their claims. Further, plaintiffs have not shown that they will be irreparably injured if an injunction does not issue at this stage, since the parties stipulated in open Court that no testing would be conducted under the EUP prior to completion of the EPA's investigation of AGS on March 24. The county ordinance restricting such testing is also in effect until March 28, preventing the release of INA− bacteria by AGS. Accordingly, the motion for preliminary injunction must be denied.

*Summary Judgment*

The defendants and intervenors have moved for summary judgment on the propriety of EPA's issuance of the EUPs to AGS. At oral argument, EPA represented to the Court that it is in the process of investigating AGS, based on the media's allegations of unauthorized testing and inadequate laboratory controls. Based upon its findings, the EPA may choose to revoke the EUP or impose sanctions against AGS. *See* FIFRA § 5(e), 7 U.S.C. § 136c(e); 40 C.F.R. § 172.10 (authorizing EUP revocation). Should the agency decide to revoke the EUP before any testing has occurred, it would moot any decision by the Court as to the permit's propriety. On the other hand, if the agency determines that revocation is not warranted, it is possible—and indeed likely—that plaintiffs would seek review of that decision under the APA. Thus, out of deference for the ongoing administrative proceedings, and in the interests of judicial economy, the Court shall withhold decision on the motions for summary judgment until the EPA completes its investigation. The parties shall apprise the Court of the results of the investigation, in accordance with the accompanying order.

Plaintiffs have moved under Fed.R.Civ.P. 56(f) for a continuance of the Court's decision on summary judgment to enable them to conduct discovery related to the media reports of AGS' alleged testing violations. Specifically, plaintiffs contend that discovery may provide evidence of the pathogenicity of the mutant bacteria, which they claim is relevant to their challenge to the agency's EUP review.[3] The Court is of the opinion that discovery involving these issues is not warranted, since it would not aid in plaintiffs' challenge to the adequacy of the record before the agency at the time the decision was made or to the adequacy of the agency's procedure. Plaintiffs admit that the evidence they seek to discover was not before EPA during the EUP review. Affidavit of Jeremy Rifkin. When the permit was issued, the EPA had no reason to doubt the accuracy of AGS' data. *See* Affidavit of Frederick S. Betz, ¶ 16, February 28, 1986. Plaintiffs have access to the entire record that was before the agency when it decided to issue the EUPs,

---

3. Plaintiffs also seek discovery of data on AGS' greenhouse controls, based on the media's representation of their inadequacy. Speculation that evidence might exist that would undermine data in the administrative record is not an adequate basis to grant a continuance.

and additional data not before the agency cannot serve as a basis to challenge the decision. A continuance to permit discovery of such data is therefore not appropriate in light of the present posture of the case.[4] Thus, although no decision on the summary judgment motions will be made at this time, plaintiffs' Rule 56(f) motion shall be denied.

---

4. The evidence plaintiffs seek may be relevant to a future challenge to any action the EPA takes after review of the EUPs. Any challenge would have to be directed to the administrative record upon which the EPA bases its eventual revocation decision. It is premature to grant a continuance to permit discovery in aid of such a challenge, when the decision has not been made and the administrative record has not been compiled. Plaintiffs could not even begin to show that discovery of materials not in the record is necessary or relevant to this Court's limited review.